May it please the Court, Steve Zalesin for Duke University. In its prior decision in this case, this Court identified two errors in the Board's original decision in validating Claim 9. First, the Board applied an improper claim construction and treated the claim element that the GAA, the enzyme in question, quote, is a precursor as if it needed to only include or be part of a mixture of precursor and non-precursor forms. That was error number one. The second error was, as the Court pointed out in a footnote, number two in its original decision, that the presumption of nexus had not been properly applied by the Board and that the Board otherwise failed to give appropriate consideration to the objective indicia of non-obviousness evidence that Duke had brought forward. On remand, the Board committed precisely the same two errors. First, it read prior art disclosures and expert declarations that refer to, quote, precursor as though they addressed GAA that is exclusively a precursor when in fact those references in that testimony referred to a mixture of precursor and non-precursor forms. But the Board referred to testimony including a Cucucci study which talked about greater than 90 percent, and this is an obviousness case. Yes. So we're getting close to exclusively precursor form. I agree it's close, Your Honor, but if we... And so we're reviewing whether the Board erred. Yes, that's correct, Your Honor, but there was no testimony in the case... There was mistaken testimony by BioMarin's experts because they were applying the wrong claim construction that Cucucci and Bigevoet and a number of other prior art preclinical studies had used the precursor form, they referred to it, when in fact it was a mixture. And Cucucci is a mixture, although it is predominantly over 90 percent. Most of the other prior art references, for example the Van Brie patent, which comes up quite a bit, it was preferably predominantly namely greater than 50 percent. More than 50, right. Well, more than 90 is quite a bit different from more than 50. In that particular animal model, that's what was described, but there is no disclosure or teaching there and no testimony from anybody in the record that a person of ordinary skill in the art would have read Cucucci, which by the way is not a reference on which trial was instituted. The asserted combination on which trial was instituted is Reusser 771 and Van Hove 1997, not Cucucci. But even taking Cucucci as relevant background, there was no testimony or evidence of any other sort that a person of ordinary skill would have arrived at the claimed invention of exclusively precursor, derived from Cho cells, by combining the asserted references of Reusser and Van Hove 1997. And to illustrate... Can I just ask this? Isn't part of what the board found with at least some cases in the record that by the priority date, it was pretty well understood that the mechanism by which the RHEAA would get into the cells was one that depended on a portion of the molecule that was in the precursor, but not in the, I guess the truncated version. And therefore, why wouldn't, if you could get pure precursor, why wouldn't you use only that? A couple of points on that, Judge Toronto. First, there is no teaching in either of the asserted references or in the testimony that you could get purely precursor. No reference discloses that. Second, although you are correct that there are a variety of prior art references that state that for efficient uptake into the cells, the precursor has the proper glycosylation and other markers to be recognized by the receptors, there is also teaching in the prior art that in the lysosomes, the other forms, the mature forms are what are active. And we are talking about a disease that affects the entire body, skeleton muscle, heart muscle, liver, kidney, spleen, et cetera, et cetera. And in the earlier studies, what the data showed is that the mature form, the non-precursor form was taken up by these other organs. Now those other organs are affected in the disease, so it is not intuitively obvious or necessarily the right conclusion that you would want exclusively precursor. You might well want a mixture, which is what all of the other prior art references taught before the Chen patent taught and claimed exclusively precursor as the preferred embodiment to be administered to treat the disease. And in regard to the... Did some of what you just said about an affirmative benefit from having some, at least, of the mature form get testified to by the experts? There was no testimony by either party's experts on that subject. What we have is the prior art references, which teach a mixture. And we have, I would say, a failure of proof on the part of the challenger here, BioMarin, challenging the patent to demonstrate that a exclusively precursor version of the enzyme was taught or suggested by the prior art and that there would be a reasonable expectation of success in achieving the claimed invention, namely an effective treatment for the disease using that form of the enzyme. Did the parties have an opportunity on remand to submit anything? Yes. The opportunity exists because even before the adoption of the standard operating procedure and the board that permits that type of submission on remand, the board was permitting that. The board issued its decision on remand. Neither party requested the opportunity to submit additional evidence. BioMarin, having relied on expert declarations that were predicated on the wrong claim construction, where a mixture was all that was required, could have... And the board panel itself didn't provide a notice saying, here's the opportunity. It just went about its business. The board did not do that. It went about its business, and one day a decision came in the board. The last thing I wanted to point out on the references, Your Honor, is that it is demonstrably clear, and this is set forth in detail in our papers, that when BioMarin's experts were testifying about, quote, the precursor form, they were not referring to exclusively a precursor, but rather a mixture of precursor and non-precursor forms. For example, Dr. Krogan, who by the way admitted he's not a person of ordinary skill and did not view the evidence through that lens, said of Reusser, one of the two references, that the GAA, quote, produced in the examples of Reusser 771 from the milk of transgenic mammals, and described in the 712 patent produced in Cho cells in Dr. Chen's lab, have the same size of 110 kilodaltons, the precursor form. That's at page A722 of the appendix. That is simply not what Reusser says. Reusser describes a mixture of 110 and 76 kilodaltons, i.e. precursor and non-precursor forms. The only way these experts could have made statements like they did is by construing references to precursor as though they meant exclusively precursor, which is not in fact what the references say or what they teach. Turning then to the board's second error, the treatment or mistreatment of the objective indicia of non-obviousness. The evidence in this case, candidly, is off the charts. This invention provides the first and only effective approved treatment for a previously fatal disease, a breakthrough that had eluded scientists for decades. Before you talk about the specifics, did you ever say to the board you should apply a presumption of nexus? We did not, Your Honor. Why isn't it a little hard to fault the board for not doing that? Because in its opinion, its first opinion in this case, this court said that the board erred by failing to apply a presumption of nexus. I think the footnote says this appears well taken. Yes. That doesn't quite say we hereby declare that something that you forfeited by not preserving is now legitimately at play. Well, the exact footnote says, notably, Duke's objection to the board's treatment of its evidence of objective indicia of non-obviousness, including its failure to apply a presumption of nexus, appear well taken. I don't understand the fuss about the presumption. If there was, is, and apparently was shown, a relationship, a substantial benefit, why do you need a presumption? We actually don't. Are you saying that it can't be shown without the presumption? It would not be found? So, the law on this says, as I understand it, and this is from the Elexam case and the Centracut case, that where the patent owner proves that the commercial embodiment, quote, is the patented invention, and we prove that with undisputed evidence, that the drugs, myozyme and lumozyme, that are marketed for the purpose of treating the disease with an underlying, and they are administered by doctors according to the instructions in Claim 1, from which Claim 9 depends. So, once that is established, and we did have an economist, Mr. Green, who put in an extensive declaration tying the commercial success, praise, success in solving a long-felt need, et cetera, to these products and the practice claims. To exclusively precursor? Yes. Or to HGGAA, because the material was in the prior art. In fact, some of it was by your own inventor. And so, the board said, we find that the patent owner does not provide evidence sufficient to permit a determination as to what long-felt need was met by any alleged novel feature, which means exclusively, as opposed to, say, 50% or 90%. Correct. And there is no prior art teaching of exclusively precursor. We went over that. And there is undisputed evidence. But there is prior art teaching of the use of this material. Yes. And we are not saying that we discovered precursor. That is not our point. What we are saying is that this is the first teaching in the prior art of treating the disease with exclusively a precursor form of the enzyme. Right. But let me just, I guess, frame the question that's in my mind and why, in this case, the presumption might make a difference. There was remarkably little evidence from either side about whether there would have been comparable success from, let's say, VanBree, which is just before this. And the only difference between VanBree and this is exclusivity. If there's no evidence on that question, the presumption may decide it. But if there is no presumption and you had to show the nexus of exclusivity to success, that is, that only because of the exclusivity was there success, whereas 90% wouldn't have been successful, doesn't really sound that plausible on its face. Without some evidence saying why exclusivity would make a giant difference in whether there was going to be a successful product, then the presumption might make all the difference. That's, I guess, just to address that. Your Honor, the marketed form of the drug, the only approved version of the drug anywhere in the world, and the only one that's ever been successfully given to a patient to treat the disease, is the exclusively precursor form. But why does that necessarily establish that, for example, if VanBree had, VanBree was also owned by Genzyme, is that right? It was by that time. So Genzyme now has VanBree in its quiver and it has this and it says, let's do this one, let's not pursue VanBree. But the nexus question is maybe somebody else had they owned VanBree, would have pursued VanBree and gotten FDA approval. These are unknowns because the record is remarkably thin. Fair enough, it is an unknown and that's what the Board said. That they can't conclude on the record whether the commercial success is truly attributable to the exclusively precursor feature or VanBree. That's the one they explicitly cited. That, Your Honor, is a failure of proof on BioMarin's part. They had the burden. We established, as the law required us to do, that the success derives from the commercial success and other indicia derive from the use and sale of the exclusively precursor form. They could have had an expert say, it's really due to VanBree. All they did is say, maybe it's due to VanBree. And that's not good enough under Elexam, CetraCut, and other cases decided by the court. I see I'm past my rebuttal time. No, we will save your rebuttal. Let's hear from the other side. Thank you. Mr. Murphy? Yes. May it please the Court, my name is Gerald Murphy, representing BioMarin Pharmaceuticals. I have a few points I'd like to make. The first is we disagree with the argument that all of the prior art teaches a mixture. I think there's a word game going on here. I think some of the prior art that had actually been used in certain early experiments, early, I'm talking about three or four or five years before the filing date. VanBree is roughly 95. Yeah, right around that time, from the 95 to 2000 date. They used what they had at the time. And they hadn't necessarily all purified it to the level that they might need to get FDA approval, which is basically highly pure product. They were research articles. They hadn't necessarily put it in humans yet. But the whole idea of purifying this active compound, it was all over the place. And in terms of specific teachings, the two main references, I'll just point to what they actually teach. Reusser states, restoration of the endogenous alpha-glucosidase activity by alpha-glucosidase isolated from mouse milk was as efficient as restoration from the same drug from cho-cells. And that's Appendix 6-7, 6 and 7, 536, which is page 28, lines 10 to 14 of Reusser. Also, Dr. Krogan, who was our expert that spent the most time talking about purification, stated that Reusser teaches that the precursor should be, quote, highly purified. That's cited at BioMarin's brief, page 4, citing APPX 642, paragraph 58 of the declaration. Turning to VanHoe 97, which is the other main reference, it says that the precursor 110-acet-alpha-glucosidase isolated from tissue culture medium. So, isolated doesn't say the words of the claim construction exclusively, but it's certainly isolated, and there's been a lot of discussion about VanHoe that I won't go over again. It's important that Duke ignores two important references that talk about purifying the drug to homogeneity. They were argued in our brief, and specifically, the two references are Band Brief 410 and Fuller. And we've discussed Fuller on pages 6-7 of our brief, and I'll just read a couple quotes. Can I just ask you, what do you make of Duke's point that purification means, I guess I'll put it as two points, never mind whether Duke makes these or not. One is purification is getting rid of what you would call impurities, as opposed to getting only the precursor and not the mature. And second, even if you purify, why would you necessarily use only the purified form? Maybe you get a nice pure batch of precursor and you decide, I'm going to use that mixed with 10% of mature, so that the heart gets the benefit of what we think the mature one is doing. Well, all of the evidence teaches that the active form is the precursor form. The fact that once it gets to where it's supposed to be, it gets broken down into the mature form. What's the best evidence that says the only active form is the precursor form? I mean, it's everywhere. Then it should be really easy. Okay, okay. Let's see. I've seen a lot of quotes that say efficiency is greater or things like that. Well, just Vanbury 410. Vanbury indicates that a small amount of impurities can be tolerated. I guess it depends on how you interpret impurities. But basically up to about 5% can be tolerated. And the current batches are greater than 95% pure. So Vanbury itself actually talks about purity of greater than 95%. That's cited in Vanbury. Right, but let me just try to focus. I'm interested in the question of what the mechanism of successful action in the body is. What art says the only form of the RHGAA or any form of the GAA that will do anybody any good is the precursor form? As opposed to it will do more good to have more of it. Every study that measured the activity of the precursor versus mature form found no activity. Because they did actually separate them out. They found no activity when the mature form was used. In fact, the very earliest study from the 1960s, and it's cited in our brief, they used a form that they didn't realize at the time was the mature form and nothing happened. There was no benefit to the patient. I think the patient probably died. This is back in the 60s. So there was a long felt need. But by about 1990, there was a seminal article. I don't remember which one it is right now, but we have it in our brief. They said, ah, now we know why those earlier studies failed, because they were using the mature form. And the mature form was missing something. Yeah, it's missing a piece off the end. It's an incomplete molecule. It's like you have this great drug, and if you cut the end of it off, this protein, it doesn't work anymore. And they didn't realize that back in the 60s, but that was reported in the early 90s. And then all of a sudden, about 95, there was article after article after article came out saying, hey, this is it. This is where we're going to go. We're either going to go with producing it in mammals, which is Van Brie, or cho-cells, which is all of Dr. Chen's work. There's seven or eight, probably, publications of Dr. Chen, including press releases. Everybody's working on the precursor form towards the end. And the two references I'd like to point out that they were kind of ignored in Duke's briefs. Van Brie says, most preferably, the object species is purified to essential homogeneity. The object species is obviously the precursor in the context of the invention. And then Fuller, at APPX 38-44 and 38-39, mentions that the precursor recombinant GAA was purified to homogeneity, had a molecular mass. So everybody, I mean, there may be individual studies where they didn't know that it was homogeneous, they didn't know how pure it was. But clearly, everybody, Fuller specifically talks about purifying it to homogeneity, as well as Van Hove, 1997. So, I mean, I think everything says use the purified molecule. And our witnesses testified to that. And we argued that at the board. Purified which? Precursor? Yeah, purified precursor all by itself. That's where everybody was going. So, I mean, I think it's all in the briefs. There's not one scintilla of evidence that says the mature form might give some benefit. All the evidence says the precursor is where you get your benefit. That's where they were going, but nobody actually did it, produced it, put it through the system? Yeah, it hadn't gotten through FDA yet. I mean, it was all in the art. It was all in the prior art. This is the good stuff, the highly purified stuff. So, it would still reside in the scientific literature. Maybe even prizes would be awarded. It wouldn't be available to the public because the final proof, which is the philosophy for why the FDA has such rigorous requirements, hadn't been achieved. So, now, in retrospect, we say, well, that was obvious. Anybody could have done that. But if so, why are those rigorous requirements in the system? Well, that's for the safety of the patients, basically. They want to make sure it works, it's safe and effective. But just because you get FDA approval, maybe because you're the first one to get FDA approval, doesn't mean you should. It's a patentable invention where it's all over the prior art. It's just somebody's got to get the approval first. Well, it's hard to tell because the FDA statutes and all the rest have a good deal to say about patents and Orange Book and all of the Paragraph 4 certifications and so on. So, it isn't as if these systems are operating in an unrelated matter. I'm trying to figure out how the public interest of providing products to the public weighs in determining the objective obviousness. Well, so, the public interest, I mean, patents are in the public interest, but there's multiple patents on this product. Roycer got a patent, the same Roycer reference that we're talking about as a PCT publication. They got a patent. They got FDA exclusivity. They got patent term extension. That was listed as covering the product. This is all in our brief. The two Van Brie patents were also listed as covering that patent. Are you arguing that the precursor, exclusively precursor molecule lacks novelty? Oh, yeah. Yes. I mean, right here, the molecule itself is purified to homogeneity right here in Fuller. It's in our brief. And you can see they talked about purified to homogeneity. And this is from ChoCell's, APX3844 and 3839. The ChoCell's limitation is critical because that's in the claim. Sure. Sure. Yeah. That's important. One thing I'd also like to point out is that the board said that they didn't feel that Duke even proved that their product is covered by the claims of the patent. We talked about nexus. I think regardless of whether there's a presumption or no presumption, to get that presumption, you at least need to show that your claims cover your product. And I'm going to point to the board's statement in the supplemental final written decision on page 18. And I believe they may have said this twice. And I have a quote here. Just give me a moment, please. Are you referring to in particular the record before us does not elucidate adequately the impact of the patent as compared to other relevant patents on licensing revenues? That's not what I was looking for. On page 18 of the supplemental final written decision, joint appendix page 18, patent owner does not show adequately that... Top, bottom, where? Pardon me? Top, bottom, where? Oh, so middle of the first full paragraph. Yeah. Patent owner does not show adequately that myozyme and lumozyme are the invention disclosed and claimed in Claim 9. We have, if you look at the three expert declarations, none of the three experts of Duke ever talked about exclusively the precursor. None of those three witnesses said that in their declarations. And none of them had firsthand knowledge of it. I mean, they basically said, oh, the claims cover the product. Okay. So what does that mean? I mean, I think there wasn't really any real proof there that what is the approved product. Dukat knows what the approved product is. They never came in and even showed it. They didn't have their witnesses say... They criticized our witnesses for not talking about the claim construction when they gave their opinions and gave their testimony on what the art teaches. Their witnesses didn't either. They just said all the claims cover it. There was no discussion of Claim 9 and what that means in terms of their opinions. So I think it's just... But that wasn't challenged on cross-examination, was it? These distinctions among the claims? I don't see... It's not in the brief by either party. So I don't think it was covered in cross-examination. Well, then how can you criticize it as being somehow unsupported or rejected? I'm just saying the board said patent owner does not adequately... Does not show adequately that Myozyme and Lumizyme are the invention disclosed and claimed in Claim 9. That's why we're here. Yeah, right, right. I don't think that they showed it. But even if they did show it, there's four patents that covered it that were based on earlier filed work that are all listed as covering it. And there's no attempt to break down Claim 9 and show why Claim 9 is important. And there's no attempt by any of their... Well, if no one challenged it, why do they have to do it? Okay, let's go to the next thing. What was challenged? The patents. Answer my question. Okay. As a matter of trial procedure. Okay. If they make a statement and no one challenges it, now you're telling us that statement is not supported? I was just reporting. I was just stating what the board said. So they said they didn't adequately prove it. Their witnesses didn't break it down and talk about it like what's in the claim. Is that a fact-finding to which we are deference? What the board said? Yeah, I would say it is. Yeah. The claim interpretation is legal, but whether or not they proved that it actually falls within the claim, that would be fact-finding. Is the FDA label or other FDA information in A, the record, B, the joint appendix? Yes. Does that say whether all of the RHGAA in the product is precursor? The answer is no, it doesn't. And I looked at several times the evidence cited by Duke where they said, oh, we did prove it, and they cited several things from the labels or draft labels for the two products. Are those in the joint appendix? Yes. I can give you the page numbers. I believe it's joint appendix 3815 to 3817 for myozyme and 3830 to 3831 for lumozyme prescribing information. And it's not there. They didn't quote that it's there. They didn't try to say, you know, use the language of the claim. And I looked for it. I didn't see it. It's not pointed out anywhere. And I think you said, you made a reference to the material Duke cited. Yes. What is the sum total of that material?  Only 3815 to 3817 and 3830 to 3831. Maybe a page before or after that. And it's not there. There's no statement that it's homogeneous or only the precursor. It's just not there. Any more questions for Mr. Murphy? Thank you. Thank you. Okay. Mr. Sallison for your rebuttal. Thank you, Your Honor. Let me start where we just left off. The evidence that Duke put forward as to whether the Claim 9 is practiced consists of declarations by Doctors Wasserstein and Cummings, which can be found at page 1888 through 89 of the case of Cummings. And what they both said is they both went through all the claims that were in dispute and said every one of these claims except Claims 5 through 7, which deal with particular dosages that clinical practice showed were not high enough to provide the desired benefit, said all the other claims are practiced. So that would include, clearly, Claim 9. Biomarin never disputed or challenged that. Second, the labeling that Mr. Murphy refers to says explicitly, I'm reading in the case of myozyme, which is at page 3816 of the appendix, GAA is a glycoprotein with a calculated mass of, excuse me, a total mass of 110 kilodaltons, including carbohydrates. That is the precursor. I'm sorry. Just tell me what page you were looking at. It's the first text that appears on page 3816 of the appendix. It says it's 110 kilodaltons. That is the precursor. The exact same statement appears for lumizyme at page 3831 of the appendix in the first full paragraph. Except it says 109,000 kilodaltons, which is 109 kilodaltons. That's, again, the precursor form. Purification. I believe, quite honestly, that there's some confusion here about going on with respect to what is meant by purification and clearly what Biomarin's experts meant by it. Dr. Krogan, their expert, for example, said that purification referred to, quote, removing adventitious virus from the finished product. That's at page 713 through 14 of the appendix. When there's a description of purified to homogeneity, there is nothing in the reference and certainly in the testimony that says that that means purifying the precursor form to homogeneity as opposed to isolating the GAA enzyme in whatever form from the medium in which it's produced. Whether it's rabbit milk in the case of the transgenic mammals or Cho cell culture medium in the case of Cho cells. Finally, with respect to Judge Newman's questions about FDA approval and what have you, this is the long felt need story in a nutshell. No one had discovered or proved an effective treatment for this disease until Dr. Chen did it with exclusively precursor material in the clinic. And that is a revolutionary invention in the treatment of this previously fatal disease for infants and children that there is no teaching of the prior art that pointed to or suggested that and certainly no testimony from Biomarin's experts that a person of ordinary skill in the art would have come to that invention by combining Reusser 771 with Van Hove 1997. Neither of those references contains a teaching of exclusively precursor or suggests it and there's no evidence that a person of ordinary skill would have gotten there. So on that record, just like there was no sufficient evidence on Claim 19, the one that this court reinstated the last time this case was before you, Claim 9 should be reinstated. There is no evidence from which the court can conclude that Biomarin met its burden to show obviousness. Thank you. Thank you both. The case is taken under submission.